**FILED** LM
4/8/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Erin Kelly (312) 886-9083

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MARIO NEUSTADTER

CASE NUMBER: 26 CR 158

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about February 4, 2026, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Did knowingly and intentionally distribute a controlled substance, namely, 50 grams or more of methamphetamine (actual), a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

CAMRYN HAMILTON
Special Agent, Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: April 8, 2026

*Judge's signature*

City and state: Chicago, Illinois

YOUNG B. KIM, U.S. Magistrate Judge

*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, CAMRYN HAMILTON, being duly sworn, state as follows:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since approximately August 2025. As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. I am currently assigned to the DEA Chicago Field Office. My official duties include the investigation of drug trafficking organizations and violations of federal narcotics laws, including offenses defined by 21 U.S.C. §§ 841, 843, and 846.

3. I attended the DEA Training Academy in Quantico, VA for approximately 18 weeks from August 2025 to December 2025. During my time at the DEA Training Academy, I received training in various topics such as surveillance, drug identification, seizing evidence, tactical operations, defensive tactics, firearms, law, interview and interrogation principles, arresting procedures, and how to investigate Title 21 crimes. As part of my official duties as a DEA Special Agent, I investigate drug-trafficking organizations and violations of federal narcotics laws, including offenses defined by Title 21, United States Code, Sections 841, 843, and 846.

4. Through these investigations, my training and experience, and conversations with other law enforcement officers, I have become familiar with the methods used by narcotics traffickers to distribute, transport, store, import, and safeguard-controlled substances. I know that narcotics trafficking organizations have developed a number of methods to insulate their illegal activities from law enforcement detection. For instance, I am familiar with the coded language used by narcotics traffickers during conversations in an attempt to disguise the true meaning of their conversations.

5. This affidavit is submitted in support of a criminal complaint alleging that MARIO NEUSTADTER ("NEUSTADTER") violated Title 21, United States Code, Section 841. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging NEUSTADTER with distribution of methamphetamine, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

6. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, my training and experience and the training and experience of other law enforcement agents with whom I have consulted.

## FACTS SUPPORTING PROBABLE CAUSE

### A.     Summary of Probable Cause

7.     Since in or around January 2026 to February 2026, the DEA Chicago Field Division, along with the Cook County Sheriff's Police Department, began conducting an investigation into NEUSTADTER after receiving information from a cooperating source ("CS")[1] that an unknown male sold narcotics in the Chicagoland area.[2] CS told law enforcement that the unknown male, later identified by law enforcement as NEUSTADTER,[3] is involved in the purchase of narcotics in

---

[1] The CS started cooperating with the DEA in or around August 2021 after law enforcement recovered cocaine from him/her. The CS is cooperating in hope of receiving potential sentencing consideration in connection with that law enforcement encounter. According to a law enforcement database, the CS has five prior arrests with four convictions. I believe the information provided by the CS set forth in this affidavit is reliable because it has been corroborated in significant respects by surveillance, third-party records, and other information described in this affidavit.

[2] The CS described the unknown male, later identified by law enforcement as NEUSTADTER, as a male black subject, 40's or 50's, who drove vehicles with dealer registration plates. According to the CS, when the CS first met with NEUSTADTER, NEUSTADTER was driving a BMW. The CS also met with NEUSTADTER several times in the past to discuss narcotics in the area of the McDonalds located at 2525 South Martin Luther King Drive, in Chicago (the 'King Drive McDonalds"), or near a hospital in that same area. In or around November 2025, the CS met with NEUSTADTER at the King Drive McDonalds, and NEUSTADTER was driving a Tesla bearing Illinois dealer registration DL6189E. During that conversation, NEUSTADTER agreed to provide narcotics to an associate of the CS and the CS agreed to provide that associate with NEUSTADTER's phone number. The CS related that s/he discussed pricing with NEUSTADTER as approximately $1,500 per pound of crystal methamphetamine and approximately $40 per gram for fentanyl for purchases of approximately 100 grams or more.

[3] The unknown male was identified by law enforcement as NEUSTADTER as follows: As described further below, on January 9, 2026, utilizing an undercover law enforcement officer ("UC-1"), law enforcement coordinated the purchase of approximately 100 grams of fentanyl in Chicago from an unknown male, who was using phone number XXX-XXX-3077 (the "3077 Number"). Prior to the narcotics transaction, NEUSTADTER initially met with UC-1 in a parking lot and told UC-1 that NEUSTADTER had to pick up his son from school. NEUSTADTER told UC-1 he would meet with UC-1 and provide UC-1 with approximately 100 grams of fentanyl after he picked up his son from school. Law enforcement maintained continuous mobile surveillance on NEUSTADTER and observed him drive directly to a school

California, and the sale, and distribution of those narcotics throughout the Chicagoland area, and that he is also known to use storage units to store narcotics. In addition, the CS told law enforcement that the unknown male (NEUSTADTER) has a narcotics associate ("Individual A"), and gave law enforcement Individual A's phone number (the "Individual A Phone") to use if law enforcement officials had trouble contacting NEUSTADTER directly.

8.      During the time period of approximately January 9, 2026 through February 4, 2026, an undercover law enforcement officer ("UC-1") conducted three controlled narcotics transactions with NEUSTADTER as summarized below.

| DATE | APPROXIMATE QUANTITY | CONTROLLED SUBSTANCE | PRICE |
|---|---|---|---|
| January 9, 2026 | 124 grams | Fentanyl | $3,500 |
| January 20, 2026 | 127 grams | Fentanyl[4] | $3,500 |
| February 4, 2026 | 445 grams (427 actual) | Methamphetamine[5] | $1,500 |

located in the 600 block of East 85th Street in Chicago and pick up a male juvenile. Based on the information obtained from the surveillance, law enforcement conducted a search of accessible databases and learned a subject using the name "Steven Williams" with phone number XXX-XXX-1035 were associated with the juvenile male subject picked up from the school in the 600 block of East 85th Street at the same time observed during surveillance. A search of phone number XXX-XXX-1035 through open-source databases showed that it was associated with a subject named Mario NEUSTADTER with a date of birth July 8, 1978. A further search of law enforcement databases showed the last name "Williams" was documented as an alias used by NEUSTADTER on his criminal history. On or about January 15, 2026, UC-1 reviewed an unmarked photograph of NEUSTADTER maintained by the Illinois Secretary of State and positively identified him as the subject who met and sold approximately 100 grams of suspect fentanyl to UC-1 on January 9, 2026.

[4] The substances distributed on January 9, 2026, field-tested positive for fentanyl. The DEA submitted the substances to the DEA laboratory for testing and analysis, and those results are pending. Estimated drug weights include the weight of the packaging.

[5] The substance lab-tested positive for methamphetamine.

**B.     On Approximately January 9, 2026, NEUSTADTER Distributes Fentanyl to UC-1.**

9.      On approximately January 9, 2026, law enforcement conducted surveillance of NEUSTADTER in anticipation of a controlled narcotics transaction between UC-1 and NEUSTADTER. At approximately 2:10 p.m., surveillance observed NEUSTADTER driving in his white Tesla Model Y bearing Illinois dealer plate registration 6189E (the "Tesla"), at E. 25th Street and Stevenson Expressway in Chicago.[6]

10.     According to UC-1, on approximately January 9, 2026, at approximately 10:46 a.m., UC-1 placed an unrecorded phone call to the 3077 Number. UC-1 and the UM spoke for approximately one minute and 21 seconds. According to UC-1, during this phone call, UC-1 and NEUSTADTER agreed to meet at the intersection of 95th and Stony Island. Additionally, UC-1 stated, not verbatim, that UC-1 wanted 100 for 35, meaning 100 grams of fentanyl for $3,500. UC-1 and NEUSTADTER then agreed to meet later that day at 12:30 p.m. for the controlled narcotics transaction. As detailed above, in footnote 3, above, law enforcement later identified the UM who had spoken with UC-1 on January 9, 2026, using the 3077 Number as NEUSTADTER.

11.     According to UC-1, following this call, UC-1 traveled to a Burger King restaurant located on the 1700 block of E. 95th Street, in Chicago (the "95th Street Burger King") UC-1 was equipped with an audio recording device. After arriving at the 95th Street Burger King, UC-1 traveled a short distance to the parking lot of a

---

[6] Illinois Dealer registration 6189E is registered to Tonys Southside Towing at 2829 West 167th Street Unit 8, in Markham, Illinois.

Jewel-Osco located in the 1600 block of E. 95th Street, in Chicago (the "95th Street Jewel").

12.    . On January 9, 2026, at approximately 12:00 p.m., law enforcement established surveillance on NEUSTADTER at the 95th Street Burger King.

13.    According to UC-1, at approximately 1:06 p.m., UC-1 called NEUSTADTER at the 3077 Number and UC-1 told NEUSTADTER where UC-1 was located. During the same phone call, NEUSTADTER stated to UC-1 that NEUSTADTER was driving the Tesla and then proceeded to park next to UC-1 in the Jewel-Osco parking lot.

14.    At approximately 1:10 p.m. law enforcement observed NEUSTADTER driving the Tesla, enter the 95th Street Jewel parking lot. At approximately 1:12 p.m., UC-1 entered NEUSTADTER's Tesla. According to UC-1's and UC-1's description of the audio recording device, the following conversation occurred:[7]

    a.    NEUSTADTER stated, "You just be wanting [U/I] like I have different ones." UC-1 responded, "[U/I] just grind it up," which UC-1 understood to mean that NEUSTADTER could grind up the fentanyl because it did not matter what form the fentanyl was in. NEUSTADTER then stated, "[U/I] don't really give a fuck." UC-1 responded, "[U/I] I don't give a fuck... just bag it up... whatever you want with it." NEUSTADTER responded, "[U/I] I got one of this kind and one of that kind," which UC-1 understood to mean that NEUSTADTER had fentanyl off of "the brick"

---

[7] The transcript of this recording is in draft form, is not a final work product, and is subject to additional revisions.

or in powder form. UC-1 then replied, "[U/I] this is going down to college. [U/I] they pressing this into pills and all that other shit," by which UC-1 was explaining that again it did not matter what form the fentanyl was in because UC-1 was planning to sell it to kids at college who would then press the fentanyl into pills. NEUSTADTER then stated, "Yeah they um... I gotta pick my son up... they called." UC-1 asked, "How, how long you need?" and NEUSTADTER responded, "Gonna pick him up from school. Gonna be like 20 minutes. 30 minutes at most."

15.     According to UC-1 and UC-1's description of the recording device, UC-1 and NEUSTADTER then agreed to meet later that day at a Culver's restaurant located at 35th Street and S. King Drive in Chicago (the "King Drive Culver's") because NEUSTADTER had not provided UC-1 with any of the fentanyl that UC-1 had previously ordered. UC-1 then exited NEUSTADTER's Tesla and departed the area.

16.     According to UC-1, on January 9, 2026, at approximately 1:20 p.m., UC-1 traveled to the King Drive Culver's and waited approximately an hour and 20 minutes for NEUSTADTER.

17.     At approximately 2:06 p.m., UC-1 called NEUSTADTER at the 3077 Number and NEUSTADTER did not answer. At approximately 2:11 p.m., NEUSTADTER, using the 3077 Number, called UC-1 back stated that he was at a grocery store located in the 400 block of E. 34th Street, in Chicago. According to UC-1, UC-1 then observed NEUSTADTER in the Tesla in the parking lot next to the King Drive Culver's.

7

18.     At approximately 2:10 p.m., law enforcement located NEUSTADTER driving the Tesla at the intersection of E. 25th Street and Stevenson Expressway. According to UC-1, at approximately 2:11 p.m., NEUSTADTER, using the 3077 Number, called UC-1 back and stated that he was at a Jewel located in the 400 block of E. 34th Street, in Chicago. UC-1 then drove to where NEUSTADTER was located, and UC-1 was directed by NEUSTADTER to follow NEUSTADTER. UC-1 then followed NEUSTADTER to the 3600 block of Rhodes Ave, in Chicago.

19.     At approximately 2:15 p.m., NEUSTADTER and UC-1 met near the 3600 block of S. Rhodes Ave, in Chicago. According to UC-1, UC-1 exited UC-1's vehicle and entered the backseat of the Tesla. UC-1 observed that NEUSTADTER was in the driver's seat and that a juvenile was seated in the front seat of the Tesla. According to UC-1 and UC-1's description of the recording device, NEUSTADTER reached into a black book bag that was on the rear back floor of the Tesla and handed to UC-1 a baggy that contained a white rock-like substance containing suspect fentanyl.[8] UC-1 then handed to NEUSTADTER a gray Walmart bag that contained $3,500 in government funds. NEUSTADTER then counted the money and stated, "Alright we're good." UC-1 then asked NEUSTADTER how UC-1 should save NEUSTADTER's phone number and NEUSTADTER responded that UC-1 could save his number as "Mo" or "Moe." The UC then said, "I will be in touch if this works out,"

---

[8] The substance, with packaging, weighed approximately 124 grams and field-tested positive for fentanyl.

and NEUSTADTER replied, "Let me know you made it safe." UC-1 responded, "Got you." At approximately 2:18 p.m., UC-1 exited the Tesla and departed the area.

**C. On approximately January 20, 2026, NEUSTADTER Distributes Fentanyl to UC-1.**

20. According to UC-1, on January 19, 2026, at approximately 4:30 p.m., UC-1 placed an unrecorded phone call to NEUSTADTER at the 3077 Number. According to UC-1, during this call, UC-1 and NEUSTADTER discussed meeting up because UC-1 wanted the same product, meaning 100 grams of fentanyl, that UC-1 had purchased from NEUSTADTER on January 9, 2026. According to UC-1, NEUSTADTER responded, not verbatim, that NEUSTADTER got UC-1 and instructed UC-1 to, "Just hit me."

21. On January 20, 2026, at approximately 7:30 a.m., law enforcement established on NEUSTADTER at his residence located on South Indiana Ave, in Chicago (the "Indiana Ave Residence") in anticipation of a controlled narcotics transaction between UC-1 and NEUSTADTER.

22. At approximately 1:42 p.m., UC-1 placed an unrecorded phone call to NEUSTADTER at the 3077 Number. NEUSTADTER stated that he would call UC-1 back in approximately 20 minutes, but NEUSTADTER wanted to meet UC-1 somewhere right off the expressway at the intersection of 87th and Lafayette in Chicago. At approximately 2:52 p.m., UC-1 placed another phone call to NEUSTADTER at the 3077 Number, but NEUSTADTER did not answer. At approximately 3:02 p.m., UC-1 called NEUSTADTER at the 3077 Number and

NEUSTADTER agreed to meet UC-1 at a Wendy's restaurant located at 8740 S. Lafayette Ave, in Chicago (the "Lafayette Ave Wendy's").

23. At approximately 3:22 p.m., law enforcement observed the Tesla and a Black Kia registered to Individual B, leave the garage behind the Indiana Ave Residence.[9]

24. At approximately 3:36 p.m., law enforcement observed NEUSTADTER driving the Tesla in the vicinity of a CubeSmart Self-Storage located at 407 E. 25th Street in Chicago (the "CubeSmart Facility"). At approximately 4:00 p.m., surveillance observed NEUSTADTER exit the overhead door of the CubeSmart Facility and drive westbound on 25th Street to northbound on King Drive.

25. At approximately 3:38 p.m., NEUSTADTER, using the 3077 Number, called UC-1 and told UC-1 to meet NEUSTADTER at the King Drive Culver's instead of Lafayette Ave Wendy's.

26. At approximately 4:00 p.m., law enforcement observed NEUSTADTER exit the overhead door of the CubeSmart Facility and drive westbound on 25th Street to northbound on King Drive. NEUSTADTER then turned around on King Drive and drove southbound on King Drive, in what appeared to be a counter-surveillance

---

[9] As described above in footnote 3, law enforcement identified NEUSTADTER based on information gathered during this investigation. A search of NEUSTADTER through law enforcement databases showed NEUSTADTER had a white 2020 Tesla Model Y bearing Illinois registration FG55042 registered to him at the 9000 block of South Crandon Avenue, in Chicago. A search of Illinois registration FG55042 through a License Plate Reader (LPR) database showed that it was captured parked in the area of the Indiana Residence on numerous dates in 2025, including inside the garage of the Indiana Residence with the overhead door open on October 16, 2025, at approximately 11:48 p.m. As documented above, NEUSTADTER was observed by law enforcement parking the Tesla inside the garage of the Indiana Residence after meeting with the UC on January 9, 2026.

technique. At approximately 4:03 p.m., law enforcement observed NEUSTADTER drive the Tesla into the parking lot of the King Drive Culver's, where UC-1 was in the vicinity waiting for NEUSTADTER.

27. At approximately 4:05 p.m., law enforcement observed NEUSTADTER drive Eastbound on 33rd and then Southbound on Cottage Grove, with UC-1 following behind NEUSTADTER. UC-1 was equipped with an audio recording device.

28. At approximately 4:08 p.m., law enforcement observed NEUSTADTER park in front of the approximate location of 3424 S. Cottage Grove Ave, in Chicago and observed UC-1 enter NEUSTADTER's Tesla. According to UC-1, NEUSTADTER provided UC-1 with a gray plastic shopping bag that contained a clear plastic zip lock bag that contained a white rock like substance containing suspect fentanyl.[10]  In exchange, UC-1 provided NEUSTADTER with $3,500 in government funds, exited the Tesla, and departed the area.

29. According to electronic surveillance footage held at the CubeSmart Facility, prior to the transaction with UC-1, NEUSTADTER pulled into the CubeSmart Facility at approximately 3:40 p.m., (approximately 28 minutes before the controlled narcotics transaction with UC-1) and was captured inside of the CubeSmart Facility. According to the CubeSmart Facility Locations Manager and a review of CubeSmart records, law enforcement learned that NEUSTADTER used an

---

[10] The substance, with packaging, weighed approximately 127 grams. Law enforcement did not field test the substance.

access code for Unit 984 to enter the CubeSmart Facility. Video stills of NEUSTADTER at the CubeSmart Facility appear below:



30.     As mentioned above, at approximately 4:00 p.m., law enforcement observed NEUSTADTER exit the overhead door of the CubeSmart Facility, and at approximately 4:08 p.m., law enforcement observed NEUSTADTER park in front of the approximate location of 3424 S. Cottage Grove Ave and meet with UC-1 for the controlled narcotics transaction.

**D.     On approximately February 4, 2026, NEUSTADTER Distributes Methamphetamine to UC-1.**

31.     According to UC-1, on approximately February 3, 2026, at approximately 5:49 p.m., the UC-1 placed an unrecorded phone call to NEUSTADTER at the 3077 Number. According to UC-1, the phone call went straight to voicemail, and law enforcement believed NEUSTADTER might have dropped his phone number.

32.     According to UC-1, on approximately February 3, 2026, UC-1 called Individual A at the Individual A Number. Individual A then appeared to place a call to NEUSTADTER using another phone, and Individual A placed NEUSTADTER on

speaker so that UC-1, Individual A, and NEUSTADTER could participate in a conference call. Based on UC-1's prior interactions with NEUSTADTER, including the calls with NEUSTADTER and the in-person controlled narcotics transactions described in this affidavit, UC-1 recognized the voice of the person that Individual A placed on speaker as NEUSTADTER's voice.

33.     According to UC-1, during their conversation, Individual A and NEUSTADTER told UC-1 that NEUSTADTER was not comfortable speaking with UC-1 over the telephone because UC-1 had an Android phone and not an iPhone, and NEUSTADTER was only comfortable speaking to UC-1 through the iPhone FaceTime feature. According to UC-1, during their conversation, UC-1 stated that he wanted "the other thing" that NEUSTADTER can provide, referencing methamphetamine, and UC-1 explained he wanted to purchase "it," meaning approximately one pound of methamphetamine, for "twelve," meaning $1,200.[11] NEUSTADTER then corrected UC-1 and stated that the price of the substance was actually $1,500. NEUSTADTER agreed to meet the UC-1 on approximately February 4, 2026, to complete the narcotics transaction.

34.     According to UC-1, on or about February 4, 2026, Individual A contacted UC-1 by telephone and told UC-1 to meet NEUSTADTER at a Chase Bank, located at 353 W. 83rd Street in Chicago (the "Chase Bank"). On February 4, 2026, at approximately 2:45 p.m., law enforcement observed NEUSTADTER drive the Tesla

---

[11] As described in footnote 2, above, the CS told law enforcement that NEUSTADTER sold both fentanyl and methamphetamine.

through several parking lots near the Chase Bank. According to law enforcement, NEUSTADTER parked in the parking lot of JJ Fish & Chicken located at 8300 South Holland Road in Chicago. According to law enforcement, at approximately 2:45 p.m., the UC-1, who was equipped with an audio recording device, parked in the parking lot of JJ Fish & Chicken and approached the Tesla.

35. According to UC-1, on approximately February 4, 2026, at approximately 2:48 p.m., UC-1 entered the front passenger side of the Tesla. According to UC-1, UC-1 and NEUSTADTER spoke about the Super Bowl and NEUSTADTER explained to UC-1 that NEUSTADTER had not changed the 3077 Number, but instead NEUSTADTER had blocked UC-1 because NEUSTADTER wanted UC-1 to use an iPhone rather than an Android.

36. According to UC-1, NEUSTADTER provided UC-1 with a gray Walmart plastic bag, containing a clear plastic zip lock bag that contained a white crystal-like substance. According to UC-1, UC-1 provided NEUSTADTER with $1,500 in exchange for the narcotics. According to UC-1, UC-1 then left the Tesla. At approximately 2:52 p.m., law enforcement observed UC-1 return to UC-1's vehicle.

37. After the meeting with UC-1 and NEUSTADTER, UC-1 and investigators met at a pre-determined location where UC-1 turned over a bag received from NEUSTADTER that contained methamphetamine. According to the DEA laboratory, the substance that NEUSTADTER distributed to UC-1 weighed a total of approximately 445 grams and lab-tested positive for pure (actual) methamphetamine in the amount of approximately 427 grams.

## CONCLUSION

38.     Based on the foregoing, I believe there is probable cause to believe that, on or about February 4, 2026, MARIO NEUSTADTER did knowingly and intentionally distribute a controlled substance, namely, 50 grams or more of methamphetamine (actual), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

CAMRYN HAMILTON
Special Agent, Drug Enforcement Administration

SWORN TO AND AFFIRMED by telephone
April 8, 2026.

Honorable YOUNG B. KIM
United States Magistrate Judge

15